**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

In re:                                              :

                                                    : Chapter 11
CALPINE CORPORATION, <u>et</u> <u>al.</u>,          : Case No. 05-60200 (BRL)

                                                    :
              Debtors.                              :

-------------------------------------------------------------------x

HSBC BANK USA, N.A., AS SUCCESSOR                   :
INDENTURE TRUSTEE FOR
THE 6% CONVERTIBLE NOTES DUE 2014                   :
AND THE 4.75% CONTINGENT                            :
CONVERTIBLE NOTES DUE 2023,                         : Civil Action No. 07 CV 7832 (JGK)

                                                    :

                                                    :

                                                    :
                 Appellant,                         :

                                                    :
              -against-                             :

                                                    :
CALPINE CORPORATION AND ITS                         :
AFFILIATED DEBTORS AND DEBTORS                      :
IN POSSESSION, OFFICIAL COMMITTEE                   :
OF UNSECURED CREDITORS OF                           :
CALPINE CORPORATION, OFFICIAL                       :
COMMITTEE OF EQUITY SECURITY                        :
HOLDERS,                                            :

                                                    :
                 Appellees.                         :

-------------------------------------------------------------------x

**RECORD APPENDIX TO OPENING BRIEF OF**
**APPELLANT HSBC BANK USA, N.A.,**
**AS SUCCESSOR INDENTURE TRUSTEE FOR**
<u>**THE 4.75% AND 6.00% CONTINGENT CONVERTIBLE NOTES**</u>

Sarah L. Reid (SR-4603)
David E. Retter (DR-4014)
Damon W. Suden (DS-8384)
Jennifer A. Christian (JC-7305)
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

HSBC BANK USA, N.A., AS SUCCESSOR
INDENTURE TRUSTEE FOR THE 6% AND 4.75%
CONTINGENT CONVERTIBLE NOTEHOLDERS

1. Proof of Claim No. 2823 filed by HSBC Bank USA, National Association, as Successor Indenture Trustee.

2. Notice of Filing of Supplement to Proof of Claim No. 2823 filed by Christena A. Lambrianakos on behalf of HSBC Bank USA, National Association, as Successor Indenture Trustee [Docket 4162].

3. Notice of Filing of Supplement to Proof of Claim No. 2823 filed by Jennifer Christian on behalf of HSBC Bank USA, National Association, as Successor Indenture Trustee [Docket 4680].

1

| **United States Bankruptcy Court**<br>**Southern District of New York** | **PROOF OF CLAIM** | |
|---|---|---|

In re (Name of Debtor)
Calpine Corporation

Case Number:
05-60200 (BRL)

**RECEIVED**

**AUG 0 2 2006**

**KURTZMAN CARSON**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor
*(The person or entity to whom the debtor owes money or property)*
HSBC Bank USA, National Association, as successor Indenture Trustee

Name and Addresses Where Notices Should be Sent

HSBC Bank USA, N.A.
452 Fifth Avenue
New York, NY 10018-2706
Attn: Ms. Sandra E. Horwitz
Vice President
(212) 525-1358

Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attn: David E. Retter, Esq.
Christena A. Lambrianakos, Esq.
(212) 808-7800

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☒ Check box if the address differs from the address on the envelope sent to you by the court.

Claim # 2823
USBC SDNY
Calpine Corporation
05-60200

THIS SPACE IS FOR
COURT USE ONLY

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:
**Amended and Restated Indenture, dated as of March 12, 2004, pursuant to which $633,775,000 aggregate principal amount of Calpine Corporation's 4.75% Contingent Convertible Notes Due 2023 were issued and remain outstanding. (See Attachment.)**

Check here if this claim:  ☐ replaces   ☐ amends   a previously filed claim, dated: _____

**1. BASIS FOR CLAIM:**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other (Describe briefly) (See Attachment.)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensations (Fill out below)
Your social security number _____
Unpaid compensations for services performed
From _____ to _____
(date)      (date)

2. DATE DEBT WAS INCURRED: **on or about March 12, 2004**

3. IF COURT JUDGMENT, DATE OBTAINED:

4.    CLASSIFICATION OF CLAIM. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another.
CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM.

☐ SECURED CLAIM
Attach evidence of perfection of security interest.
Brief Description of Collateral:

☐ Real Estate  ☐ Motor Vehicle  ☐ Other (Describe briefly)
Amount of arrearage and other charges included in secured claim above, if any $

☒ UNSECURED NONPRIORITY CLAIM  **$636,701,808.16***
A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.
**\*Plus additional interest, Trustee Expenses and all other amounts due under the Indenture, the Notes, at law or in equity. (See Attachment.)**

☐ UNSECURED PRIORITY CLAIM $_____

Specify the priority of the claim.

☐ Wages, salaries, or commissions (up to $4,300), earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier—11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan—U.S.C. § 507(a)(4)
☐ Up to $1,950 of deposits toward purchase, lease, or rental of property or services of personal, family, or household use—11 U.S.C. § 507(a)(6)
☐ Taxes or penalties of governmental units—11 U.S.C. § 507(a)(8)
☐ Other—11 U.S.C. § 507(a)

| 5.    TOTAL AMOUNT OF CLAIM AT TIME CASE FILED: | **$636,701,808.16***<br>(Unsecured) | $<br>(Secured) | $<br>(Priority) | **$636,701,808.16*** (See Attachment.)<br>(Total) |
|---|---|---|---|---|

**\*Plus additional interest, Trustee Expenses and all other amounts due. (See Attachment.)**

☐    Check this box if claim includes prepetition charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

6.    CREDITS AND SETOFFS: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

**This claim is not subject to any setoff or counterclaim.**

THIS SPACE IS FOR
COURT USE ONLY

7.    SUPPORTING DOCUMENTS: *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8.    TIME-STAMPED COPY: To receive an acknowledgement of the filing of your claim, enclose envelope and copy of this proof of claim.

Date:
July 26, 2006

Sign and print the name and title, if any, of the creditor or other person (attach copy of power of attorney, if any):
x *Sandra E Horwitz* , Sandra E. Horwitz, Vice President

0560200060727000000000033

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

NJ01/LAMBC/108554.1

ATTACHMENT TO PROOF OF CLAIM OF
<u>HSBC BANK USA, AS SUCCESSOR INDENTURE TRUSTEE</u>

1.     BASIS FOR CLAIM

HSBC Bank USA, National Association ("HSBC") is the successor Indenture Trustee, under the Amended and Restated Indenture, dated as of March 12, 2004 (the "Indenture"), between Calpine Corporation (the "Company"), as Issuer, and Wilmington Trust Company, as predecessor Indenture Trustee (the "Predecessor Indenture Trustee" and together with HSBC, collectively, the "Indenture Trustees"), pursuant to which the Company issued $900,000,000 aggregate principal amount of its 4.75% Contingent Convertible Notes Due 2023 (the "Notes"). A copy of the Indenture is annexed hereto as Exhibit A, and all provisions of the Notes and the Indenture are expressly incorporated herein by reference.

2.     TOTAL AMOUNT OF CLAIM AT TIME CASE FILED

On December 20, 2005 (the "Petition Date"), the Company filed with this Court a petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* As of the Petition Date, the Company was, and still is, indebted to HSBC, as Indenture Trustee, in the following amounts:

(a)     Principal Amount:  $633,775,000.00.

(b)     Interest:

(i)     $2,926,808.16 accrued unpaid interest to the Petition Date;

(ii)     plus accrued unpaid interest from the Petition Date at the rate of interest borne by the Notes; and

(iii)     interest on overdue principal and interest on overdue installments of interest and other amounts owing, if any, to the extent lawful, at the rate borne by the Notes.

(c)     Trustee Expenses:

The Company is obligated to the Indenture Trustees for all amounts due and to become due to the Indenture Trustees for their compensation for services and for all reasonable disbursements, advances and expenses incurred by the Indenture Trustees, including, but not limited to, the compensation and out-of-pocket disbursements and expenses of the Indenture Trustees' agents and counsel, under Section 7.07 of the Indenture ("Trustee Expenses"), and for all other amounts, including, without limitation, indemnification obligations, due or to become due to the Indenture Trustees under Section 7.07 of the Indenture.  The Indenture Trustees have incurred Trustee Expenses prior to the Petition Date and continue to incur Trustee Expenses from and after the Petition Date, which amounts are not fixed at this time but constitute a part of this claim.

(d)    Other Unliquidated Amounts:

The Company is obligated to HSBC, as Indenture Trustee, for any and all other amounts due or to become due under the Indenture and the Notes, whether now due or hereafter arising, which amounts may, presently, be unliquidated or contingent, but may become fixed and liquidated in the future, including, but not limited to, amounts as or for interest, liquidated damages, optional or mandatory redemptions, redemption premiums, redemption prices, expenses, indemnities, compensatory, secondary and/or punitive damages, and all compensation obligations, including, but not limited to, compensation obligations to the paying agent and registrar, all present or future stamp, court, documentary, excise or property taxes, charges or similar levies, the holders' rights to require the Company to purchase the Notes in connection with a change of control and/or asset sales, and any and all payment obligations of, or relating to, any other or additional amounts, any registration obligations under the Registration Rights Agreement dated September 5, 1997, between the Company and Credit Suisse First Boston

Corporation, the Indenture covenants limiting Liens, Sale and Leaseback Transactions, and

Issuance of Additional Notes, and change of control payments, asset sales and excess proceeds,

all as defined and described in the Notes and the Indenture.

3.    INQUIRY NOTICE

This Proof of Claim serves, and is intended to serve, as notice of a claim for

any amount due or to become due under the Notes or the Indenture, the provisions each of

which are expressly incorporated herein by reference, whether or not summarized or

identified specifically in this Proof of Claim, and all interested parties are on notice of, and

advised to examine the provisions of, the Notes and the Indenture.

4.    RESERVATION OF RIGHTS

HSBC does not waive, and expressly reserves, all rights and remedies at law

or in equity that HSBC, individually or as Indenture Trustee (including the Predecessor

Indenture Trustee), has or may have against the Company and/or any of the Company's

affiliates and subsidiaries, or any other person or entity, including, without limitation, rights

against the holders of the Notes (the "Noteholders").  HSBC reserves the right to amend or

supplement this claim at any time and in any respect, including, without limitation, as

necessary or appropriate to amend, quantify or correct amounts, to provide additional detail

regarding the claims set forth herein, or to fix the amount of any contingent or unliquidated

claim.

5.    JURISDICTION

In filing the within claim, HSBC does not submit itself to the jurisdiction of

this Court for any purpose other than with respect to the allowance of this claim for any and

all amounts due under the Indenture and the Notes, and does not consent to the jurisdiction of

NJ01/LAMBC/108554.1

this Court to adjudicate any other matter relating to the Indenture or the rights and remedies of the Indenture Trustees and/or the Noteholders, including, without limitation, any adjudication concerning the charging lien and other lien rights granted to the Indenture Trustees, and/or priority in payment accorded to the Indenture Trustees, pursuant to the Indenture and related documents in connection with the issuance of the Notes described herein.

## Exhibit A

Amended and Restated Indenture, dated as of March 12, 2004

NJ01/LAMBC/108554.1

CALPINE CORPORATION

4.75% CONTINGENT CONVERTIBLE NOTES DUE 2023

AMENDED AND RESTATED

INDENTURE

Dated as of March 12, 2004

WILMINGTON TRUST COMPANY

Trustee

NY: 378358-7

## CROSS-REFERENCE TABLE*

*Trust Indenture*
*Act Section*                                    *Indenture Section*

| Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 12.03 |
| (c) | 12.03 |
| 313(a) | 7.06 |
| (b)(1) | 10.03 |
| (b)(2) | 7.06; 7.07 |
| (c) | 7.06; 12.03 |
| (d) | 7.06 |
| 314(a) | 4.03 |
| (a)(4) | 12.05 |
| (b) | N.A. |
| (c)(3) | N.A. |
| (e) | 12.05 |
| (f) | N.A. |
| 315(a) | 7.01 |
| (b) | 7.05 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316(a) (last sentence) | 2.09 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 2.12 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318(a) | N.A. |
| (b) | 12.03 |
| (c) | 12.01; 12.02; 12.03 |

N.A. means not applicable.
* This Cross Reference Table is not part of this Indenture.

TABLE OF CONTENTS

*Page*

**ARTICLE 1.**
DEFINITIONS AND INCORPORATION
BY REFERENCE

| | | |
|---|---|---|
| Section 1.01 | Definitions. | 1 |
| Section 1.02 | Other Definitions. | 11 |
| Section 1.03 | Incorporation by Reference of Trust Indenture Act. | 12 |
| Section 1.04 | Rules of Construction. | 12 |

**ARTICLE 2.**
THE NOTES

| | | |
|---|---|---|
| Section 2.01 | Form and Dating. | 12 |
| Section 2.02 | Execution and Authentication. | 13 |
| Section 2.03 | Registrar, Paying Agent and Conversion Agent. | 13 |
| Section 2.04 | Paying Agent to Hold Money in Trust. | 14 |
| Section 2.05 | Holder Lists. | 14 |
| Section 2.06 | Transfer and Exchange. | 14 |
| Section 2.07 | Replacement Notes. | 20 |
| Section 2.08 | Outstanding Notes. | 20 |
| Section 2.09 | Treasury Notes. | 21 |
| Section 2.10 | Temporary Notes. | 21 |
| Section 2.11 | Cancellation. | 21 |
| Section 2.12 | Defaulted Interest. | 21 |

**ARTICLE 3.**
REDEMPTION AND PREPAYMENT

| | | |
|---|---|---|
| Section 3.01 | Notices to Trustee. | 22 |
| Section 3.02 | Selection of Notes to Be Redeemed or Purchased. | 22 |
| Section 3.03 | Notice of Optional Redemption. | 22 |
| Section 3.04 | Effect of Notice of Optional Redemption. | 23 |
| Section 3.05 | Deposit of Redemption or Purchase Price. | 23 |
| Section 3.06 | Notes Redeemed or Purchased in Part. | 24 |
| Section 3.07 | Optional Redemption. | 24 |
| Section 3.08 | Mandatory Redemption. | 24 |
| Section 3.09 | Purchase of Notes at Option of the Holder. | 24 |
| Section 3.10 | Purchase of Notes at Option of the Holder upon Change in Control. | 29 |
| Section 3.11 | Effect of Purchase Notice or Change in Control Purchase Notice. | 34 |
| Section 3.12 | Deposit of Purchase Price or Change in Control Purchase Price. | 35 |
| Section 3.13 | Notes Purchased in Part. | 35 |
| Section 3.14 | Covenant to Comply With Securities Laws Upon Purchase of Notes. | 35 |
| Section 3.15 | Repayment to the Company. | 36 |

**ARTICLE 4.**
COVENANTS

| | | |
|---|---|---|
| Section 4.01 | Payment of Notes. | 36 |
| Section 4.02 | Maintenance of Office or Agency. | 36 |
| Section 4.03 | Reports. | 37 |
| Section 4.04 | Compliance Certificate. | 37 |

i

Section 4.05     Taxes. .......................................................................................... 38
Section 4.06     Stay, Extension and Usury Laws. ............................................... 38
Section 4.07     [Reserved.] .................................................................................. 38
Section 4.08     [Reserved.] .................................................................................. 38
Section 4.09     [Reserved.] .................................................................................. 38
Section 4.10     [Reserved.] .................................................................................. 38
Section 4.11     [Reserved.] .................................................................................. 38
Section 4.12     Liens. ........................................................................................... 39
Section 4.13     [Reserved.] .................................................................................. 40
Section 4.14     Corporate Existence. ................................................................... 40
Section 4.15     [Reserved.] .................................................................................. 41
Section 4.16     Limitation on Sale and Leaseback Transactions. ...................... 41
Section 4.17     [Reserved.] .................................................................................. 41
Section 4.18     [Reserved.] .................................................................................. 41
Section 4.19     [Reserved.] .................................................................................. 41
Section 4.20     [Reserved.] .................................................................................. 42
Section 4.21     Issuance of Additional Notes. ..................................................... 42

**ARTICLE 5.**
SUCCESSORS

Section 5.01     Merger, Consolidation, or Sale of Assets. .................................. 42
Section 5.02     Successor Corporation Substituted. ........................................... 42

**ARTICLE 6.**
DEFAULTS AND REMEDIES

Section 6.01     Events of Default. ....................................................................... 43
Section 6.02     Acceleration. ............................................................................... 44
Section 6.03     Other Remedies. ......................................................................... 45
Section 6.04     Waiver of Past Defaults. ............................................................. 45
Section 6.05     Control by Majority. ................................................................... 45
Section 6.06     Limitation on Suits. .................................................................... 45
Section 6.07     Rights of Holders of Notes to Receive Payment. ..................... 46
Section 6.08     Collection Suit by Trustee. ......................................................... 46
Section 6.09     Trustee May File Proofs of Claim. ............................................ 46
Section 6.10     Priorities. ..................................................................................... 47
Section 6.11     Undertaking for Costs. ............................................................... 47

**ARTICLE 7.**
TRUSTEE

Section 7.01     Duties of Trustee. ....................................................................... 47
Section 7.02     Rights of Trustee. ....................................................................... 48
Section 7.03     Individual Rights of Trustee. ..................................................... 49
Section 7.04     Trustee's Disclaimer. .................................................................. 49
Section 7.05     Notice of Defaults. ...................................................................... 49
Section 7.06     Reports by Trustee to Holders of the Notes. ............................ 49
Section 7.07     Compensation and Indemnity. ................................................... 50
Section 7.08     Replacement of Trustee. ............................................................. 50
Section 7.09     Successor Trustee by Merger, etc. ............................................. 51
Section 7.10     Eligibility; Disqualification. ....................................................... 51
Section 7.11     Preferential Collection of Claims Against Company. ............... 52

ii

## ARTICLE 8.
### LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01   Option to Effect Legal Defeasance or Covenant Defeasance. ........................................... 52
Section 8.02   Legal Defeasance and Discharge. ................................................................................ 52
Section 8.03   Covenant Defeasance. ................................................................................................. 52
Section 8.04   Conditions to Legal or Covenant Defeasance. ............................................................ 53
Section 8.05   Deposited Money and Government Securities to be Held in Trust; Other
               Miscellaneous Provisions. .......................................................................................... 54
Section 8.06   Repayment to the Company. ........................................................................................ 54
Section 8.07   Reinstatement. ............................................................................................................. 55

## ARTICLE 9.
### AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01   Without Consent of Holders of Notes. .......................................................................... 55
Section 9.02   With Consent of Holders of Notes. ............................................................................... 56
Section 9.03   Compliance with Trust Indenture Act. ......................................................................... 57
Section 9.04   Revocation and Effect of Consents. ............................................................................. 57
Section 9.05   Notation on or Exchange of Notes. .............................................................................. 57
Section 9.06   Trustee to Sign Amendments, etc. ................................................................................ 57

## ARTICLE 10.
### CONVERSION

Section 10.01   Conversion Privilege. ................................................................................................. 58
Section 10.02   Conversion Procedure. ............................................................................................... 60
Section 10.03   Taxes on Conversion. ................................................................................................. 61
Section 10.04   Company to Provide Stock. ......................................................................................... 61
Section 10.05   Adjustment of Conversion Price. ................................................................................ 61
Section 10.06   When No Adjustment Required. ................................................................................... 64
Section 10.07   When Adjustment May Be Deferred. ............................................................................ 65
Section 10.08   Successive Adjustments. ............................................................................................. 65
Section 10.09   Notice of Adjustment. ................................................................................................. 65
Section 10.10   Notice of Certain Transactions. ................................................................................. 65
Section 10.11   Effect of Reclassification, Consolidation, Merger, Share Exchange or Sale on
                Conversion Privilege. ................................................................................................. 65
Section 10.12   Trustee's Disclaimer. .................................................................................................. 66
Section 10.13   Voluntary Reduction. ................................................................................................. 67
Section 10.14   Conversion Value of Notes Tendered. ......................................................................... 67

## ARTICLE 11.
### SATISFACTION AND DISCHARGE

Section 11.01   Satisfaction and Discharge. ....................................................................................... 68
Section 11.02   Application of Trust Money. ........................................................................................ 69

## ARTICLE 12.
### MISCELLANEOUS

Section 12.01   Trust Indenture Act Controls. ..................................................................................... 69
Section 12.02   Notices. ...................................................................................................................... 70
Section 12.03   Communication by Holders of Notes with Other Holders of Notes. .............................. 71
Section 12.04   Certificate and Opinion as to Conditions Precedent. .................................................. 71
Section 12.05   Statements Required in Certificate or Opinion. .......................................................... 71

iii

Section 12.06   Rules by Trustee and Agents. ................................................................................ 71
Section 12.07   No Personal Liability of Directors, Officers, Employees and Stockholders. .................. 71
Section 12.08   Governing Law. ................................................................................................. 72
Section 12.09   No Adverse Interpretation of Other Agreements. ................................................... 72
Section 12.10   Successors. ...................................................................................................... 72
Section 12.11   Severability. ..................................................................................................... 72
Section 12.12   Counterpart Originals. ....................................................................................... 72
Section 12.13   Table of Contents, Headings, etc. ........................................................................ 72

EXHIBITS

Exhibit A       FORM OF NOTE
Exhibit B       FORM OF CERTIFICATE OF TRANSFER
Exhibit C       FORM OF CERTIFICATE OF EXCHANGE
Exhibit D       FORM OF CERTIFICATE OF ACQUIRING INSTITUTIONAL ACCREDITED
                INVESTOR

AMENDED AND RESTATED INDENTURE (as so amended and restated, the *"Indenture"*) dated as of March 1, 2004 between Calpine Corporation (the *"Company"*), a Delaware corporation, and Wilmington Trust Company (the *"Trustee"*).

WITNESSETH:

WHEREAS, the Company and the Trustee entered into an Indenture, dated as of November 14, 2003 (the *"Original Indenture"*), governing the 4.75% Contingent Convertible Notes due 2023 (the *"Notes"*) for the benefit of each other and for the equal and ratable benefit of the Holders (as defined) of the Notes;

WHEREAS, pursuant to Section 9.01 of the Original Indenture, the Company has requested that the Trustee amend and restate the Original Indenture in its entirety, without the consent of the Holders, to cure certain ambiguities, omissions, defects and inconsistencies;

WHEREAS, the Trustee, upon satisfaction of the conditions set forth in Sections 9.01 and 9.06 of the Indenture (including, without limitation, the receipt of an Officer's Certificate and an Opinion of Counsel), is willing to amend and restate the Original Indenture as hereinafter set forth; and

WHEREAS, (i) the Original Indenture is being amended and restated pursuant to this Indenture; (ii) the Notes under the Original Indenture, as amended and restated in connection with this Indenture, will be continued under this Indenture and (iii) all obligations of the Company under the Notes and the Original Indenture will be continued, amended and restated as provided herein and will not be cancelled or discharged;

NOW THEREFORE, the Company and the Trustee agree, for the benefit of each other and for the equal and ratable benefit of the Holders of the Notes, that the Original Indenture be, and it hereby is, amended and restated in its entirety as follows:

**ARTICLE I.**
DEFINITIONS AND INCORPORATION
BY REFERENCE

Section 1.01    *Definitions.*

*"144A Global Note"* means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that shall be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

*"Additional Notes"* means Notes (other than the Initial Notes) issued under the Original Indenture in accordance with Sections 2.02 and 4.21 hereof, as part of the same series as the Initial Notes.

*"Affiliate"* of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person shall be deemed to be control. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

1

*"Agent"* means any Registrar, co-registrar, Paying Agent, additional paying agent, Conversion Agent or additional conversion agent.

*"Applicable Procedures"* means, with respect to any transfer or transaction involving a Global Note or beneficial interests therein, the rules and procedures of the Depositary, for such Global Note, in each case to the extent applicable to such transaction and as in effect from time to time.

*"Attributable Debt"* in respect of a Sale and Leaseback Transaction means, as of the date of determination, the present value (discounted at the rate of interest set forth or implicit in terms of the lease (or, if not practicable to determine that rate, the rate of interest borne by the Notes), compounded annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale and Leaseback Transaction (including any period for which such lease has been extended).

*"Bankruptcy Law"* means Title 11, U.S. Code or any similar federal or state law for the relief of debtors.

*"Bid Solicitation Agent"* means The Bank of New York until the Company selects another bank, trust company or similar fiduciary agent, if any, to serve as Bid Solicitation Agent.

*"Board of Directors"* means:

(1) with respect to a corporation, the Board of Directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2) with respect to a partnership, the Board of Directors of the general partner of the partnership;

(3) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(4) with respect to any other Person, the board or committee of such Person serving a similar function.

*"Business Day"* means any day other than a Legal Holiday.

*"Capitalized Lease Obligations"* of a Person means the rental obligations under any lease of any property (whether real, personal or mixed) of which the discounted present value of the rental obligations of that Person as lessee, in conformity with GAAP, is required to be capitalized on the balance sheet of that Person. The Stated Maturity of any such lease shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

*"Capital Stock"* means:

(1) in the case of a corporation, corporate stock;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

2

(3) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

*"Change in Control"* means the occurrence of any of the following:

(1)    any Person, including any syndicate or group deemed to be a "person" under Section 13(d)(3) of the Exchange Act, acquires beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of transactions, of shares of the Company's Capital Stock entitling the Person to exercise 50% or more of the total voting power of all shares of the Company's Capital Stock that is entitled to vote generally in elections of directors, other than an acquisition by the Company, any of its Subsidiaries or any of its employee benefit plans; or

(2)    the Company merges or consolidates with or into any other Person, any merger of another Person into the Company, or the Company conveys, sells, transfers or leases all or substantially all of its assets to another Person, other than any transaction:

(a)    that does not result in any reclassification, conversion, exchange or cancellation of outstanding shares of the Company's Capital Stock,

(b)    pursuant to which the holders of the Company's Common Stock immediately prior to the transaction have the entitlement to exercise, directly or indirectly, 50% or more of the total voting power of all shares of Capital Stock entitled to vote generally in the election of directors of the continuing or surviving corporation immediately after the transaction, or

(c)    which is effected solely to change the Company's jurisdiction of incorporation and results in a reclassification, conversion or exchange or outstanding shares of the Company's Common Stock solely into shares of Common Stock of the surviving entity.

*"Common Stock"* means shares of the Company's Common Stock, $0.001 par value per share, as they exist on the date of this Indenture or any other shares of Capital Stock of the Company into which the Common Stock shall be reclassified or changed.

*"Common Stock Price"* on any date means the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such date for the Company's Common Stock as reported in composite transactions on the principal United States securities exchange on which the Company's Common Stock is traded or, if its Common Stock is not listed on a United States national or regional securities exchange, as reported by NASDAQ.

*"Company"* means Calpine Corporation, a Delaware Corporation and any and all successors thereto.

*"Consolidated Current Liabilities,"* means, as of the date of determination, the aggregate amount of consolidated liabilities of the Company and its consolidated Restricted Subsidiaries, which may

3

properly be classified as current liabilities (including taxes accrued as estimated), after eliminating (i) all inter-company items between the Company and its Subsidiaries and (ii) all current maturities of long-term Indebtedness, all as determined in accordance with GAAP.

*"Consolidated Net Tangible Assets"* means, as of the date of determination, the total amount of consolidated assets (less accumulated depreciation or amortization, allowances for doubtful receivables, other applicable reserves and other properly deductible items) under GAAP which would appear on the consolidated balance sheet of the Company and its Subsidiaries, determined in accordance with GAAP, and after giving effect to purchase accounting and after deducting therefrom, to the extent otherwise included, the amounts of:

  (a) Consolidated Current Liabilities;

  (b) minority interests in the Company's consolidated Restricted Subsidiaries held by Persons other than the Company or a Restricted Subsidiary;

  (c) excess of cost over fair value of assets of businesses acquired, as determined in good faith by the Company's Board of Directors;

  (d) any revaluation or other write-up in value of assets subsequent to December 31, 1993 as a result of a change in the method of valuation in accordance with GAAP;

  (e) unamortized debt discount and expenses and other unamortized deferred charges, goodwill, patents, trademarks, service marks, trade names, copyrights, licenses, organization or developmental expenses and other intangible items;

  (f) treasury stock; and

  (g) any cash set apart and held in a sinking fund or other analogous fund established for the purpose of redemption or other retirement of Capital Stock to the extent such obligation is not reflected in Consolidated Current Liabilities.

*"Conversion Date"* shall have the meaning as specified in Section 10.02 hereof.

*"Conversion Price"* means $6.50 per share of Common Stock as of the date of the Original Indenture, subject to the adjustments described in Section 10.05 hereof.

*"Conversion Rate"* means an amount of shares equal to $1,000 principal amount of Notes divided by the Conversion Price, which shall be 153.8462 as of the date of the Original Indenture, subject to the adjustments described in Section 10.05 hereof.

*"Corporate Trust Office of the Trustee"* shall be at the address of the Trustee specified in Section 12.02 hereof or such other address as to which the Trustee may give written notice to the Company.

*"Custodian"* means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

*"Default"* means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

4

"*Definitive Note*" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A hereto except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 hereof as the Depositary with respect to the Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Exercise Period*" means the period that is 30 calendar days from the date of the Original Indenture (or such other date as set forth in the Purchase Agreement) during which the Initial Purchasers have the right to exercise the Initial Purchaser Option.

"*Fair Market Value*" means the value that would be paid by a willing buyer to a willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Board of Directors of the Company, whose determination shall be conclusive evidence of such determination (unless otherwise provided in this Indenture).

"*GAAP*" means generally accepted accounting principles set forth in the statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect and, to the extent optional, adopted by the Company, on the applicable date of determination.

"*Global Notes*" means, individually and collectively, each of the Restricted Global Notes, substantially in the form of Exhibit A hereto issued in accordance with Section 2.01 or 2.06(b)(3) hereof.

"*Global Note Legend*" means the legend set forth in Section 2.06(e)(2), which is required to be placed on all Global Notes issued under this Indenture.

"*Government Securities*" means direct obligations of, or obligations guaranteed by, the United States of America, and the payment for which the United States pledges its full faith and credit.

"*Holder*" means a Person in whose name a Note is registered.

"*IAI Global Note*" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee that shall be issued in a denomination equal to the outstanding principal amount of the Notes sold to Institutional Accredited Investors.

"*Incur*" means, as applied to any obligation, to create, incur, issue, assume, guarantee or in any other manner become liable with respect to, contingently or otherwise, such obligation, and "Incurred," "Incurrence" and "Incurring" shall each have a correlative meaning; *provided*, *however*, that any amendment, modification or waiver of any provision of any document pursuant to which Indebtedness was previously Incurred shall not be deemed to be an Incurrence of Indebtedness as long as such amendment, modification or waiver does not (A) increase the principal or premium thereof or interest rate thereon, (B) change to an earlier date the Stated Maturity thereof or the date of any schedule or required principal payment thereon or the time or circumstances under which such Indebtedness may or shall be redeemed, (C) *if such Indebtedness is contractually subordinated in right of payment to the Notes, modify*

or affect, in any manner adverse to the Holders, such subordination or (D) if the Company is the obligor thereon, provide that a Restricted Subsidiary shall be an obligor and (ii) such Indebtedness would, after giving effect to such amendment, modification or waiver as if it were an Incurrence, be refinancing Indebtedness that is contractually subordinated in right of payment to the Notes to at least the same extent as the Indebtedness being refinanced.

*"Indebtedness"* of any Person means, without duplication:

(a) the principal of and premium *(if any premium is then due and owing) in respect of* indebtedness of such person for money borrowed;

(b) all Capitalized Lease Obligations of such person;

(c) all Obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, other than Obligations with respect to letters of credit securing Obligations (other than Obligations described in clauses (a) and (b) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit;

(d) all Obligations of the type referred to in clauses (a) through (c) above of other Persons and all dividends of other Persons for the payment of which, in either case, that Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise; and

(e) all Obligations of the type referred to in clauses (a) through (d) above of other Persons secured by any Lien on any property or asset of that Person (whether or not such obligation is assumed by that person), the amount of the obligation on any date of determination being deemed to be the lesser of the value of the property or assets or the amount of the obligation so secured.

The amount of Indebtedness of any Person at any date shall be, with respect to unconditional Obligations, the outstanding balance at such date of all such Obligations and, with respect to any contingent Obligations at such date, the maximum liability determined by such Person's Board of Directors, in good faith, in light of the facts and circumstances existing at the time, as reasonably likely to be Incurred upon the occurrence of the contingency giving rise to such Obligation.

*"Indenture"* means this indenture, as amended or supplemented from time to time.

*"Indirect Participant"* means a Person who holds a beneficial interest in a Global Note through a Participant.

*"Initial Notes"* means the first $600,000,000 aggregate principal amount of Notes issued under the Original Indenture on the date thereof.

*"Initial Purchasers"* means Deutsche Bank Securities Inc., Credit Lyonnais Securities (USA) Inc., Harris Nesbitt Corp. and Williams Capital Group LP.

*"Initial Purchaser Option"* means the right given to Deutsche Bank Securities Inc. pursuant to the Purchase Agreement to purchase, at its election, up to $300,000,000 in aggregate principal amount of Notes.

6

"*Institutional Accredited Investor*" means an institution that is an "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, who are not also QIBs.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which banking institutions in the City of New York or at a place of payment are authorized by law, regulation or executive order to remain closed. If a payment date is a Legal Holiday at a place of payment, payment may be made at that place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue on such payment for the intervening period.

"*Lien*" means any mortgage, lien, pledge, charge, or other security interest or encumbrance of any kind (including any conditional sale or other title retention agreement and any lease in the nature thereof).

"*Liquidated Damages*" has the meaning set forth in the Registration Rights Agreement.

"*Market Price*" means the average determined by the Company of the Common Stock Price of the shares for the five Trading Date period immediately preceding and including the third Trading Date prior to (a) in the case of a redemption pursuant to Section 3.09 or 3.10, the applicable Purchase Date or Change in Control Purchase Date, as the case may be, appropriately adjusted to take into account the occurrence, during the period commencing on the first of the Trading Days during such five Trading Day period and ending on such Purchase Date or Change in Control Purchase Date, as the case may be, of any event described in Section 10.05 and (b) in the case of an adjustment to the Conversion Price or Conversion Rate pursuant to Section 10.05, the applicable date fixed for the determination of stockholders entitled to receive any distribution described in Section 10.05, appropriately adjusted to take into account the occurrence, during the period commencing on the first of the Trading Days during such five Trading Day period and ending on such determination date, of any event described in Section 10.05; subject, however, in the case of both (a) and (b), to the conditions set forth in Section 10.06 and 10.07 hereof. If the shares of Common Stock are not listed on The New York Stock Exchange, then the Market Price shall be determined by the Company by reference to the Common Stock Price as reported by the National Association of Securities Dealers Automated Quotation System ("*NASDAQ*"). In the absence of such quotations, the Company shall be entitled to determine in good faith the Market Price by reference to the Common Stock Price on any date on the basis of such quotations as it considers appropriate.

"*Note Documents*" means this Indenture and the Notes (including any Additional Notes issued under the Original Indenture).

"*Notes*" has the meaning assigned to it in the preamble to this Indenture. The Initial Notes and the Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

"*Obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness (including the Notes and this Indenture).

"*Offering Circular*" means that certain Confidential Offering Circular dated November 7, 2003, as amended by the Supplement to the Confidential Offering Circular, dated January 6, 2004, with respect to offerings of the Notes.

"*Officer*" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Vice-President of such Person.

7

*"Officer's Certificate"* means a certificate signed on behalf of the Company by one Officer of the Company that meets the requirements of Section 12.05 hereof.

*"Opinion of Counsel"* means an opinion from legal counsel who is reasonably acceptable to the Trustee, that meets the requirements of Section 12.05 hereof. The counsel may be an employee of or counsel to the Company, any Subsidiary of the Company or the Trustee.

*"Participant"* means, with respect to the Depositary, a Person who has an account with the Depositary.

*"Permitted Investments"* means the following investments:

(i) any direct obligations of, or obligations fully and unconditionally guaranteed by, the United States of America, or any agency or instrumentality of the United States of America, the obligations of which are fully and unconditionally backed by the full faith and credit of the United States of America;

(ii) demand and time deposits in, certificates of deposit of, bankers' acceptances issued by, or federal funds sold by any depository institution or trust company incorporated under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state authorities, or incorporated under the laws of any other jurisdiction, so long as at the time of such investment or contractual commitment providing for such investment the unsecured commercial paper or other unsecured short-term debt obligations of such depository institution or trust company have credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P;

(iii) repurchase obligations with respect to any security described in clauses (i) or (ii) above, in each case entered into with either (A) a depository institution or trust company (acting as principal) which in respect of its short-term unsecured debt has credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P or (B) a money market fund maintained by a broker which, in respect of its short-term unsecured debt, has credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P;

(iv) unsecured debt securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof which have, at the time of such investment, credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P;

(v) unsecured commercial paper which has, at the time of such investment, credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P; and

(vi) investments in money market funds or money market mutual funds which have, at the time of such investment, credit ratings of at least P-1 (or its equivalent) or higher from Moody's and A-1 (or its equivalent) or higher from S&P (including such funds for which the Trustee or any of its Affiliates is investment manager or advisor and for which the Trustee or any of its Affiliates may receive a fee).

*"Person"* means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

*"Private Placement Legend"* means the legend set forth in Section 2.06(e)(1) to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

*"Purchase Agreement"* means the Purchase Agreement by and between the Company and Deutsche Bank Securities Inc. as representative of the several Initial Purchasers, dated as of November 6, 2003, as may be amended from time to time.

*"QIB"* means a "qualified institutional buyer" as defined in Rule 144A.

*"Registration Rights Agreement"* means the Registration Rights Agreement, dated as of November 14, 2003, among the Company and the Initial Purchasers.

*"Restricted Definitive Note"* means a Definitive Note bearing the Private Placement Legend.

*"Restricted Global Note"* means a Global Note bearing the Private Placement Legend.

*"Restricted Subsidiary"* means any Subsidiary of a Person that is not designated an Unrestricted Subsidiary by that Person's Board of Directors.

*"Rule 144"* means Rule 144 promulgated under the Securities Act.

*"Rule 144A"* means Rule 144A promulgated under the Securities Act.

*"S&P"* means Standard & Poor's Ratings Group (or, if such entity ceases to rate the Notes for reasons outside of the control of the Company, the equivalent investment grade credit rating from any other "nationally recognized statistical rating organization" (or successor concept) within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act (or successor provision) selected by the Company as a replacement agency).

*"Sale and Leaseback Transaction"* means an arrangement relating to property now owned or later acquired whereby a Person or one of such Person's Subsidiaries transfers that property to another Person and then leases it back from such Person, other than leases for a term of not more than 36 months or leases between such Person and a Wholly Owned Subsidiary of such Person or between such Person's Wholly Owned Subsidiaries.

*"SEC"* means the Securities and Exchange Commission.

*"Securities Act"* means the Securities Act of 1933, as amended.

*"Stated Maturity"* means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the documentation governing such Indebtedness as of the date of this Indenture, and shall not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

*"Subsidiary"* means, as applied to any Person, any corporation, limited or general partnership, trust, association or other business entity of which an aggregate of at least 50% of the outstanding Voting Stock, or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more Subsidiaries of such Person.

*"TIA"* means the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa-77bbbb), as amended, as in effect on the date of this Indenture, except as provided in Section 9.03 of this Indenture.

*"Trading Day"* means any regular or abbreviated trading day of The New York Stock Exchange.

9

*"Trading Price"* of the Notes on any date of determination means the average of the secondary market bid quotations per $1,000 principal amount of Notes obtained by the Bid Solicitation Agent for $5,000,000 principal amount of the Notes at approximately 3:30 p.m., New York City time, on such determination date from three independent nationally recognized securities dealers the Company selects, which may include any of the Initial Purchasers; *provided* that if at least three such bids cannot reasonably be obtained by the Bid Solicitation Agent, but two such bids are obtained, then the average of the two bids shall be used, and if only one such bid can reasonably be obtained by the Bid Solicitation Agent, this one bid shall be used. If the Bid Solicitation Agent cannot reasonably obtain at least one such bid or, in the Company's reasonable judgment, the bid quotations are not indicative of the secondary market value of the Notes, then the Trading Price of the Notes will be determined in good faith by the Bid Solicitation Agent, taking into account in such determination such factors as it, in its sole discretion after consultation with the Company, deems appropriate. The Bid Solicitation Agent shall have no obligation to determine the Trading Price of the Notes unless the Company has requested such determination in writing, and the Company shall have no obligation to make such request unless a Holder of the Notes provides the Company with reasonable evidence that the Trading Price of the Notes would be less than 95% of the product of the Common Stock Price and the Conversion Rate. At such time, the Company shall instruct the Bid Solicitation Agent in writing to determine the trading price beginning on the next Trading Day and on each successive Trading Day until the Trading Price of the Notes is greater than or equal to 95% of the product of the Common Stock Price and the Conversion Rate. The Company will notify the Trustee of the results of any Trading Price determination within a reasonable time (and, in any event, no later than three Business Days prior to the Conversion Date).

*"Trustee"* means the party named as such in the preamble to this Indenture until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor serving hereunder.

*"Unrestricted Subsidiary"* means:

(i) any Subsidiary that at the time of determination shall be designated an Unrestricted Subsidiary by a Person's Board of Directors in the manner provided below and

(ii) any Subsidiary of an Unrestricted Subsidiary.

A Person's Board of Directors may designate any Subsidiary (including any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary owns any Capital Stock of, or owns or holds any Lien on any property of, such Person or any other Subsidiary of such Person that is not a Subsidiary of the Subsidiary to be so designated, so long as the Subsidiary to be designated an Unrestricted Subsidiary and all other Subsidiaries previously so designated at the time of any determination hereunder shall, in the aggregate, have total assets not greater than 5% of the Company's Consolidated Net Tangible Assets as determined based on the consolidated balance sheet of such Person as of the end of the most recent financial quarter for which financial statements are available. A Person's Board of Directors may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided, however,* that immediately after giving effect to that designation no Default or Event of Default under this Indenture shall have occurred and be continuing.

Any such designation by a Person's Board of Directors shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the board resolution giving effect to the designation and a certificate signed by two of that Person's Officers certifying that the designation complied with these provisions. However, the failure to file the resolution and/or certificate with the Trustee shall not impair or affect the validity of the designation.

10

*"Voting Stock"* of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

*"Wholly Owned Subsidiary"* of any Person means a Subsidiary (other than an Unrestricted Subsidiary) of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

Section 1.02     *Other Definitions.*

| Term | Defined in Section |
|---|---|
| *"Authentication Order"* | 2.02 |
| *"Change in Control Notice"* | 3.10 |
| *"Change in Control Notice Date"* | 3.10 |
| *"Change in Control Purchase Date"* | 3.10 |
| *"Change in Control Purchase Notice"* | 3.10 |
| *"Change in Control Purchase Price"* | 3.10 |
| *"Company Notice"* | 3.09 |
| *"Company Notice Date"* | 3.09 |
| *"Conversion Agent"* | 2.03 |
| *"Conversion Date"* | 10.02 |
| *"Conversion Price"* | 10.05 |
| *"Conversion Value"* | 10.14 |
| *"Covenant Defeasance"* | 8.03 |
| *"DTC"* | 2.03 |
| *"Determination Date"* | 10.14 |
| *"Event of Default"* | 6.01 |
| *"Ex-Dividend Date"* | 10.01 |
| *"Expiration Time"* | 10.05 |
| *"Five Day Average Closing Stock Price"* | 10.14 |
| *"Legal Defeasance"* | 8.02 |
| *"Net Shares"* | 10.14 |
| *"Net Share Amount"* | 10.14 |
| *"Paying Agent"* | 2.03 |
| *"Pre-Dividend Sale Price"* | 10.05 |
| *"Principal Return"* | 10.14 |
| *"Principal Value Conversion"* | 10.01 |
| *"Purchase Date"* | 3.09 |
| *"Purchase Notice"* | 3.09 |
| *"Purchase Price"* | 3.09 |
| *"Purchased Shares"* | 10.05 |
| *"Quarter"* | 10.01 |
| *"Reference Date"* | 10.05 |
| *"Registrar"* | 2.03 |

Section 1.03    *Incorporation by Reference of Trust Indenture Act.*

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture.

The following TIA terms used in this Indenture have the following meanings:

*"obligor"* on the Notes means the Company and any successor obligor upon the Notes.

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule under the TIA have the meanings so assigned to them.

Section 1.04    *Rules of Construction.*

Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)    "or" is not exclusive;

(4)    words in the singular include the plural, and in the plural include the singular;

(5)    "shall" shall be interpreted to express a command;

(6)    provisions apply to successive events and transactions; and

(7)    references to sections of or rules under the Securities Act shall be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time.

## ARTICLE 2.
## THE NOTES

Section 2.01    *Form and Dating.*

(a)    *General.* The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage. Each Note shall be dated the date of its authentication. The Notes shall be in denominations of $1,000 and integral multiples thereof.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b)    *Global Notes.* Notes issued in global form shall be substantially in the form of Exhibit A attached hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in

12

the Global Note" attached thereto). Notes issued in definitive form shall be substantially in the form of Exhibit A attached hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note shall represent such of the outstanding Notes as shall be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

Section 2.02    *Execution and Authentication.*

One Officer must sign the Notes for the Company by manual or facsimile signature.

If the Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note shall nevertheless be valid.

A Note shall not be valid until authenticated by the manual signature of the Trustee. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee will, upon receipt of a written order of the Company signed by one Officer (an "*Authentication Order*"), authenticate (i) Initial Notes in an aggregate principal amount up to $600 million on the date of the Original Indenture and (ii) Additional Notes from time to time as permitted under this Indenture.

The Trustee may appoint an authenticating agent acceptable to the Company to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Company.

Section 2.03    *Registrar, Paying Agent and Conversion Agent.*

The Company shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("*Registrar*") and an office or agency where Notes may be presented for payment ("*Paying Agent*") and an office or agency where Securities may be presented for conversion ("*Conversion Agent*"). The Registrar shall keep a register of the Notes and of their transfer and exchange. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar, the term "Paying Agent" includes any additional paying agent and the term "Conversion Agent" includes any additional conversion agent. The Company may change any Conversion Agent, Paying Agent or Registrar without notice to any Holder. The Company shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Conversion Agent, Registrar, Paying Agent, the Trustee shall act as such. The Company or any of its Subsidiaries may act as Conversion Agent, Paying Agent or Registrar.

The Company initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.

The Company initially appoints the Trustee to act as the Conversion Agent, Registrar and Paying Agent and to act as Custodian with respect to the Global Notes.

Section 2.04    *Paying Agent to Hold Money in Trust.*

The Company shall require each Paying Agent other than the Trustee to agree in writing that the Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or interest on the Notes, and shall notify the Trustee of any default by the Company in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Company or a Subsidiary) shall have no further liability for the money. If the Company or a Subsidiary acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Company, the Trustee shall serve as Paying Agent for the Notes.

Section 2.05    *Holder Lists.*

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders and shall otherwise comply with TIA § 312(a). If the Trustee is not the Registrar, the Company shall furnish to the Trustee at least seven Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes and the Company shall otherwise comply with TIA § 312(a).

Section 2.06    *Transfer and Exchange.*

(a)    *Transfer and Exchange of Global Notes.*  A Global Note may not be transferred as a whole except by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. All Global Notes shall be exchanged by the Company for Definitive Notes if:

(1)    the Company delivers to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Company within 120 days after the date of such notice from the Depositary; or

(2)    the Company in its sole discretion determines that the Global Notes (in whole but not in part) should be exchanged for Definitive Notes and delivers a written notice to such effect to the Trustee.

Upon the occurrence of either of the preceding events in (1) or (2) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10 hereof, shall be authenticated by the Trustee pursuant to an Authentication Order and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a), however, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b), (c) or (f) hereof.

(b)    *Transfer and Exchange of Beneficial Interests in the Global Notes.*  The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depositary, in

14

accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also shall require compliance with either subparagraph (1) or (2) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(1)    *Transfer of Beneficial Interests in the Same Global Note.* Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(1).

(2)    *All Other Transfers and Exchanges of Beneficial Interests in Global Notes.* In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(1) above, the transferor of such beneficial interest must deliver to the Registrar both:

(A)    a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(B)    instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase.

(3)    *Transfer of Beneficial Interests to Another Restricted Global Note.* A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives the following:

(A)    if the transferee shall take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(B)    if the transferee shall take delivery in the form of a beneficial interest in the IAI Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (2)(d) thereof, if applicable.

(4)    *Transfer and Exchange of Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes.* If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Registrar of the following documentation:

(A)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (a) thereof;

15

(B)    if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C)    if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2)(a) thereof;

(D)    if such beneficial interest is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (C) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (2) thereof, if applicable;

(E)    if such beneficial interest is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2)(b) thereof; or

(F)    if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2)(c) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(f) hereof, and the Company shall execute and the Trustee shall authenticate, upon receipt of an Authentication Order, and deliver to the Person designated in such Authentication Order a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(b) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(b) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(c)    *Transfer and Exchange of Definitive Notes for Beneficial Interests.*

(1)    *Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes.* If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)    if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (b) thereof;

(B)    . if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

16

(C)     if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2)(a) thereof;

(D)     if such Restricted Definitive Note is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (C) above, a certificate to the effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (2)(d) thereof, if applicable;

(E)     if such Restricted Definitive Note is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2)(b) thereof; or

(F)     if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2)(c) thereof,

the Trustee shall cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the 144A Global Note, and in all other cases, the IAI Global Note.

(d)     *Transfer and Exchange of Definitive Notes for Definitive Notes*. Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(d), the Registrar shall register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(d).

(1)     *Restricted Definitive Notes to Restricted Definitive Notes*. Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A)     if the transfer shall be made pursuant to Rule 144A under the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(B)     if the transfer shall be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (2) thereof, if applicable.

17

(e)    *Legends.*  The following legends shall appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(1)    Private Placement Legend.

(A)    Each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THE NOTES EVIDENCED HEREBY HAVE NOT BEEN AND SHALL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A)(1) TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (2) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE), (3) TO AN INSTITUTIONAL ACCREDITED INVESTOR IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR (4) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS."

(2)    *Global Note Legend.*  Each Global Note shall bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.  UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC

(AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(f)    *Cancellation and/or Adjustment of Global Notes.*  At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof.  At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who shall take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who shall take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(g)    *General Provisions Relating to Transfers and Exchanges.*

(1)    To permit registrations of transfers and exchanges, the Company shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 or at the Registrar's request.

(2)    No service charge shall be made to a Holder of a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.06, 3.09, 3.10 and 9.05 hereof).

(3)    The Registrar shall not be required to register the transfer of or exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(4)    All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(5)    The Company shall not be required:

(A)    to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 hereof and ending at the close of business on the day of selection;

(B)    to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

19