**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------x

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| CALPINE CORPORATION, et al., | : Case No. 05-60200 (BRL) |
| | : |
| Debtors. | : |

---------------------------------------------------------x

| | |
|---|---|
| ARISTEIA CAPITAL, L.L.C., AURELIUS CAPITAL MANAGEMENT, LP, DRAWBRIDGE SPECIAL OPPORTUNITIES ADVISORS LLC, ORE HILL HUB FUND LTD., NISSWA MASTER FUND LTD., PINES EDGE VALUE INVESTORS LTD., PINES EDGE VALUE INVESTORS L.P., SILVER SANDS FUND LLC, STARK MASTER FUND LTD., 3V CAPITAL MANAGEMENT, LLC, BRENCOURT CREDIT OPPORTUNITIES MASTER, LTD., BRENCOURT MULTI-STRATEGY ENHANCED DEDICATED FUND, LP, DILLON READ U.S. FINANCE L.P., DILLON READ FINANCIAL PRODUCTS TRADING LTD., LINDEN CAPITAL L.P. AND ORE HILL HUB FUND, LTD., HSBC BANK USA, N.A., AS INDENTURE TRUSTEE FOR THE 6% CONVERTIBLE NOTES DUE 2014 AND THE 4.75% CONTINGENT CONVERTIBLE NOTES DUE 2023, AND MANUFACTURERS & TRADERS TRUST COMPANY, AS INDENTURE TRUSTEE FOR THE 7.75% CONVERTIBLE NOTES, | : : : : : : Civil Case No. 07-7832 (JGK) : (Consolidated with Civil Case Nos. : 07-CV-7830, 07-CV-7831, and : 07-CV-7867) : : : : : : : : : : : |
| Appellants, | : |
| -against- | : : |
| CALPINE CORPORATION AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION, OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CALPINE CORPORATION, OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS, | : : : : : : |
| Appellees. | : |

---------------------------------------------------------x

**REPLY BRIEF OF APPELLANT HSBC BANK USA, N.A.,**
**AS SUCCESSOR INDENTURE TRUSTEE FOR**
<u>**THE 4.75% AND 6.00% CONTINGENT CONVERTIBLE NOTES**</u>

## TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................................. 1

I.    JOINDER IN LEGAL ARGUMENTS OF THE 6.00% CONVERTIBLE NOTEHOLDERS ................................................................................................ 1

II.   THE 4.75% INDENTURE ITSELF SUPPORTS THE CONVERSION RIGHT CLAIMS ............................................................................................... 1

III.  THE BANKRUPTCY COURT'S ORDER IMPROPERLY DISALLOWED CLAIMS THAT WERE NOT BEFORE IT AND AS TO WHICH IT MADE NO FINDINGS OR RULINGS ............................................. 3

CONCLUSION ............................................................................................................ 11

## TABLE OF AUTHORITIES

### CASES

*In re Johns-Manville Corp.*,
340 B.R. 49 (S.D.N.Y. 2006), *aff'd*, 476 F.3d 118 (2d Cir. 2007)..................................................8

*Novacare Holdings, Inc. v. Mariner Post-Acute Network, Inc.*,
267 B.R. 46 (Bankr. D. Del. 2001) ..............................................................................................8

HSBC, as successor indenture trustee on behalf of the holders of the 4.75% and 6% Convertible Notes, submits, by and through its undersigned counsel, this Reply Brief in further support of reversal of the Bankruptcy Court's Order and in response to: (i) the "Brief of Debtors-Appellees" (the "Debtors' Brief"); (ii) the "Brief of Appellee Official Committee of Unsecured Creditors [etc.]" (the "Creditors Committee Brief"); and (iii) the "Opposition Brief of Appellees the Official Committee of Equity Security Holders" (the "Equity Committee Brief").[1]

## ARGUMENT

### I. JOINDER IN LEGAL ARGUMENTS OF THE 6.00% CONVERTIBLE NOTEHOLDERS

HSBC, as indenture trustee for the 4.75% and the 6% Convertible Notes, respectfully submits that the Order should be reversed. To that end, in addition to the arguments advanced herein, HSBC joins in the Reply Brief of the 6% Convertible Noteholders and adopts and incorporates the arguments advanced therein.

### II. THE 4.75% INDENTURE ITSELF SUPPORTS THE CONVERSION RIGHT CLAIMS

The 4.75% Noteholders had a right to convert their Notes at any time until the date of maturity of the Notes. The Debtors seek to take the value of this right away by prepaying the notes and not compensating the Noteholders for the lost value of the opportunity to convert. The Conversion Right was a crucial part of the consideration for the contractual agreement between the parties and does not expire whenever the Debtors default.

---

[1] All capitalized terms used but not otherwise defined in this Reply Brief have the meaning given such terms in the "Opening Brief of Appellant HSBC Bank USA, N.A., as Successor Indenture Trustee for the 4.75% and 6.00% Contingent Convertible Notes."

Section 10.01(a) of the 4.75% Indenture provides that a "Holder of a Note may convert such Note into cash and Common Stock" at any time if certain conditions are met.[2] Importantly, this right continues even after the occurrence of an Event of Default as provided in Section 10.14(d):

> If an Event of Default, as described under Section 6.01 of this Indenture has occurred and is continuing (other than a Default in a cash payment upon conversion of the Notes), the Company may not pay cash upon conversion of any Notes (other than cash in lieu of fractional shares) and instead will make payment only through the delivery of shares of Common Stock. The number of shares of Common Stock to be delivered will be equal to (A) the aggregate principal amount of Notes to be converted divided by 1,000 multiplied by (B) the Conversion Rate.

Section 6.01(8) provides that the filing of a case in bankruptcy is an Event of Default. Thus, the Indenture specifically contemplates that the Noteholders may exercise their conversion right even after bankruptcy. The Appellees have the burden – which they have not met – of identifying an explicit provision in the Indenture that allows Calpine unilaterally to abrogate that right. They have not done so.

The provision of the 4.75% Convertible Note that the Conversion Right "shall . . . expire at the close of business on the Business Day immediately preceding the date of Maturity" simply refers to the expiration of the Conversion Right immediately prior to the Stated Maturity date of the 4.75% Convertible Note of November 15, 2023 as reflected in the Note, and did not empower Calpine to terminate the Conversion Right before then. The Appellees' theory that "Maturity," as used in the Note, meant something other than the Stated Maturity is inconsistent with the text of the Indenture and

---

[2] And, Section 3.07 prohibits the Debtors from redeeming the Notes prior to November 22, 2009.

2

applicable principles of contract interpretation. (*See* 6% Convertible Noteholders' Opening Brief, at 30-33.)  In response, the sole textual support in the governing documents which Appellees proffer for their interpretation of "Maturity" in the Note is that the Indenture includes the defined term, "Stated Maturity."  Based on the existence of this defined term, they posit that the undefined term "Maturity" could never be used to mean the same thing.  This is, however, flatly belied by section 6.01(7) of the 4.75% Indenture which refers to debt which "becomes due and payable (*whether at maturity, upon redemption or acceleration or otherwise*)."  Unless the term "maturity" means the Stated Maturity, the references to "acceleration," "redemption," and "otherwise" become unnecessary.

Similarly, the argument that section 10.14(d) of the 4.75% Indenture – which specifically contemplates that the Conversion Right will survive any Event of Default – only governs the "form and value of consideration" upon default (Creditors' Brief at 26-27) misses the point that attempting to "limit" the Conversion Right upon an Event of Default (*see* Equity Committee Brief at 25) presupposes and recognizes that the right continues to exist, in spite of any default.[3]

### III. THE BANKRUPTCY COURT'S ORDER IMPROPERLY DISALLOWED CLAIMS THAT WERE NOT BEFORE IT AND AS TO WHICH IT MADE NO FINDINGS OR RULINGS

The record is clear that: (i) the Limited Objection [Docket No. 5206] made no reference to make-whole claims; (ii) the allowance or disallowance of such claims was not addressed at the hearing on the Limited Objection or in the Bankruptcy Court's bench

---

[3] The value of the Conversion Right was not at issue before the Bankruptcy Court.  The parties agreed that the value of the Conversion Right Claims would be determined at a later hearing if the Court decided that the claims should be allowed.  Thus, any arguments concerning the alleged value of the Conversion Right Claims are not before the Court at this time.

3

ruling; (iii) the Bankruptcy Court never articulated a basis for disallowing any claims other than the Conversion Right Claims; and (iv) the appellants objected to the overbreadth of the Order before it was entered. A review of the record[4] makes clear that once the appellants objected to the proposed order as being beyond the scope of the pleadings, the argument and the bench ruling, the Bankruptcy Court should have limited the Order to only those matters on which it had actually ruled.

Less than one month before filing the Limited Objection, the Debtors filed the Debtors' Motion For Entry Of An Order Allowing Limited Objection To Claims And Determining Value Of Claims (the "Debtors' Make-whole Objection") [Docket No. 4880], which clearly and forthrightly sought the disallowance of make-whole claims asserted by various indenture trustees on behalf of other debtholders. Those claims included claims under other indentures for which HSBC is the Indenture Trustee and for which it had filed proofs of claims whose language was, in all material respects, identical to that of the Proofs of Claim at issue on this appeal. Indeed, the Debtors admit that, "the 'Other Unliquidated Amounts' sections of all of the unsecured claims filed against the Debtors by HSBC are identical." (Debtors' Brief at 10, n.19.) The Debtors offer no plausible explanation why, after having filed an objection addressed to those other claims that clearly and expressly addressed make-whole claims arising under the other

---

[4] It is illuminating to juxtapose the Debtors' position regarding the adequacy of the Proofs of Claim to encompass the Conversion Right Claims with their position regarding the adequacy of the proposed order that accompanied the Limited Objection to provide notice that the Debtors were objecting to the Convertible Noteholders' make-whole claims. On the one hand, the Debtors contend that proofs of claim that specifically sought "compensatory . . . damages" for any breach of the Indentures and attached an indenture which specifically provided for a conversion right were insufficient to state a claim for breach of those conversion rights. On the other hand, they argue that a *single sentence* in a thirty-one page pleading (i.e., the Limited Objection) and a proposed order, neither of which said anything about make-whole claims, was sufficient to put the Convertible Noteholders and HSBC on notice that the Debtors were objecting to the Convertible Noteholders' make-whole claims.

indentures, the Debtors now claim to have accomplished the same result in the Limited Objection without saying anything about make-whole claims.

The Debtors try to justify their position on the basis that, "having objected in detail to all the claims the Debtors *were* aware of, the Debtors were not required to object in detail to claims they *were not* aware of." (Debtors' Brief at 48 (emphasis in original).) The claim that the Debtors "were not aware of" the Convertible Noteholders' make-whole claims is, however, belied by the Debtors' inclusion of a footnote in the previously filed Debtors' Make-whole Objection – which was addressed *solely* to make-whole claims – that expressly excluded claims of the Convertible Noteholders from that prior objection. (*See* Debtors' Make-whole Objection [Docket No. 4880] at 5, n.3.)[5]

In contrast to the Debtors' Make-whole Objection, the Limited Objection made no mention of make-whole claims, or any claims other than Conversion Right Claims. Nevertheless, the Debtors now argue that the Convertible Noteholders and HSBC should have divined the Debtors' intent to object to their make-whole claims from a single section of the "Request for Relief" section of the Limited Objection, which stated that:

**RELIEF REQUESTED**

> The Debtors object to the *New Claims* on the basis that they were not timely filed. To the extent the Court allows the Noteholders to pursue their New Claims, the Debtors object to the New Claims to the extent they seek payment beyond Principal and Interest. Accordingly, the Debtors respectfully request that the Court, pursuant to

---

[5] Moreover, the Debtors have admitted that the "Other Unliquidated Amounts" sections of the Proofs of Claim filed by HSBC on behalf of the Convertible Noteholders are "identical" to that filed on behalf of other debtholders whose make-whole claims were included in the Debtors' prior objection. (*See* Debtors' Brief at 10, n.19.) So, if the Debtors' position is to be accepted, they read the claims filed by HSBC on behalf of other debtholders to *include* make-whole claims, but did not so read proofs of claim in identical form filed on behalf of the Convertible Noteholders.

5

>section 502 of the Bankruptcy Code and Bankruptcy Rule 3007, grant the Debtors' Objection and disallow the Convertible Noteholders' claims to the extent they seek amounts beyond Principal and Interest.

(Limited Objection at 13-14 (emphasis added).)  Given the fact that everything preceding the last sentence of the "Relief Requested" referred solely to the "New Claims," which were specifically defined as conversion claims (*see id.* at 12), there was no reason for the Convertible Noteholders or HSBC to read the last sentence in the "Relief Requested" as notice that any objection was being made to claims other than the defined "New Claims." This understanding was confirmed by the course of briefing before the Bankruptcy Court which was focused on the merits and timeliness of the New Claims.[6]

>During the course of the hearing on the Limited Objection, counsel to the 6% Convertible Noteholders made clear his understanding of the limited scope of the proceeding:

>>Which brings me, Your Honor, to I think the *limited scope* of today's hearing.  It really is, is there liability, is there a breach of contract claim that is allowable as a result of the aggregation [sic] of the *conversion right*?

(Tr. at 75:12-15 (emphasis added).)  No one – not the Debtors, not the Creditors' Committee, not the Equity Committee, and not the Bankruptcy Court – said *anything* to disabuse counsel of his understanding of "the limited scope of today's hearing." Moreover, consistent with the Convertible Noteholders and HSBC's understanding, both

---

[6] The responses to the Limited Objection filed by the Creditors and Equity Committees indicate that they, too, read the Limited Objection as being addressed only to the Conversion Right Claims. (*See* "Statement of the Official Committee of Unsecured Creditors of Calpine Corporation, et al. in Support of the Debtors' Limited Objection to Convertible Noteholder Claim Nos. [etc.]" [Docket No. 5431] at 2 (noting that, "[i]n the Objection, the Debtors request the entry of an order determining that the holders of four series of unsecured convertible notes . . . are not entitled to allowed claims for damages for purported breaches of the Noteholders' conversion rights"); "Response of the Official Committee of Equity Security Holders in Support of the Debtors' Limited Objection to Convertible Noteholder Claim Nos. [etc.]" [Docket No. 5541] at 1-4 ("Introduction" addressed exclusively to "conversion rights" and making no reference to any other type of claim).)

6

the oral argument and the Bankruptcy Court's bench ruling were directed solely to the allowability *vel non* of the Conversion Right Claims.

In an attempt to foster a contrary impression, the Creditors' Committee takes selected quotations out of context. (*See* Creditors' Committee Brief at 39.) For example, the Debtors' counsel's statement that "conversion privilege claims are subsumed and consumed by the P&I claims previously filed by the holders" (Creditors' Committee Brief at 39 (citing Tr. at 55:4-6)), simply addressed the "alternative performance" theory regarding the Conversion Right Claims, not make-whole claims. (*See* Tr. at 55:1-11.) A statement by Creditors' Committee counsel was made in a similar context of addressing Conversion Right Claims (*see* Tr. at 63:1-15), as was the quoted reference to "dashed expectations" damages. (*See* Tr. at 67:2-23; Creditors' Committee Brief at 39.)

Similarly, the Bankruptcy Court's statements to which the Creditors' Committee refers at page 39 of its brief were all made in the context of discussing conversion claims. (*See* Tr. at 96:18-22 (referring to the fact that Debtors objected to the "new claims," which the Bankruptcy Court defined at Tr. 96:6-9 as "claims seeking . . . damages for 'any breach' of the conversion rights, collectively the new claims"); Tr. at 98:5-7 (referring to "entirely new claims" that seek a "double recovery based on conversion rights"); Tr. at 100:1-25 (elaborating on "double recovery" theory involved in asserting claims for "payment of debt and damages on account of a conversion right").) In fact, the Creditors' Committee cannot point to a single instance in the hearing transcript where the bankruptcy judge – or anyone else – argued about the allowability of make-whole claims. In light of this record, the Bankruptcy Court should not have entered

the overly-broad Order over the objections of the 6% Convertible Noteholders and HSBC.

In an attempt to justify the Bankruptcy Court's action, the Debtors cite this Court's decision in *In re Johns-Manville Corp.*, 340 B.R. 49 (S.D.N.Y. 2006), *aff'd*, 476 F.3d 118 (2d Cir. 2007) (*see* Debtors' Brief at 47). *Johns-Manville*, however, involved a very different set of facts. In *Johns-Manville*, the Chubb insurance company argued, nearly twenty years *after* the fact, that it was not bound by a properly-noticed order *to which Chubb never objected prior to its entry*. See id. at 68-69. Here, in contrast, both the 6% Convertible Noteholders and HSBC expressly objected to the Debtors' proposed post-hearing order, including at the conclusion of the hearing and by sending a letter to the Bankruptcy Court. (*See* App. 29.) That prompt objection should have alerted the Bankruptcy Court that the Debtors' order went well beyond the scope of what was discussed at the hearing and in the bench ruling, which should have led the Bankruptcy Court to reject the Debtors' order. *Cf. Novacare Holdings, Inc. v. Mariner Post-Acute Network, Inc. (In re Mariner Post-Acute Network Inc.)*, 267 B.R. 46, 54-56 (Bankr. D. Del. 2001) (concluding that court's order did not determine disputed title issue because, *inter alia*, there never "was any suggestion made by counsel for the Debtors at the hearing on the [motion underlying the order] that the issue of title was being decided").

This point is reintroduced by the fact that at the conclusion of the August 8, 2007 hearing, the Bankruptcy Court expressly instructed the parties to "[s]ettle an order consistent with *this decision*." (Tr. at 102:8-9 (emphasis added).) Because the matters discussed at the hearing were far more limited than the expansive order previously offered by the Debtors, a new, more focused order should have been prepared.

8

What is more, none of the Appellees has come to grips with the Bankruptcy Court's failure to provide *any* explanation for disallowing the Convertible Noteholders' make-whole claims that would enable *this Court* to review that disallowance on the merits. (*See* HSBC Opening Brief at 13-17; 6% Convertible Noteholders' Opening Brief at 49-50.[7]) The Creditors' Committee's assertion that claims other than the Conversion Right Claims were being disallowed as "untimely" (Creditors' Committee Brief at 40) is unsupported in the record; the Bankruptcy Court said nothing of the sort. Likewise, the Equity Committee's argument that the Bankruptcy Court "went well beyond its duty to make 'sufficient findings of fact and conclusions of law'" (Equity Committee Brief at 39) flies in the face of the Bankruptcy Court's failure to make a *single* finding regarding the disallowance of the make-whole claim.

Indeed, there is no rhyme or reason to the manner in which make-whole claims of similarly situated creditors have been treated in this case. When the Debtors objected to make-whole claims of other debtholders, they filed an objection which argued why such claims should be disallowed. (*See* Debtors' Make-whole Objection [Docket 4880].) Over $100 million in make-whole claims asserted by other debtholders – including claims under other indentures for which HSBC is the indenture trustee and for which it filed similar proofs of claim – have been allowed pursuant to settlements either approved by the Bankruptcy Court or set for hearing for such approval. Meanwhile, the Convertible Noteholders' make-whole claims have been summarily disallowed in a

---

[7] The 6% Convertible Noteholders referred to their "make-whole" claim in their Opposition to the Limited Objection, albeit in a footnote (*see id.* [Docket 5427] at 22-23, n.10), and the Debtors' Omnibus Reply included a half-page request that this "new" claim be disallowed as untimely (*see id.* [Docket 5540] at 8-9). But no one even mentioned this issue at the hearing, and the Bankruptcy Court did not articulate any ground for summarily disallowing this claim – whether on the basis of timeliness or otherwise. Furthermore, it is difficult to imagine how the claim could be found to be "untimely" since the Debtors did not challenge the timeliness of the other make-whole claims which were based on virtually identical Proofs of Claim.

9

proceeding that (i) was commenced by a Limited Objection containing no reference to such claims (let alone any argument as to why they were deficient); (ii) included a hearing in which no one argued the validity or invalidity of those claims; (iii) included a ruling in which the Bankruptcy Court made no findings regarding those claims; and (iv) culminated in an Order which is silent about the justification for the Bankruptcy Court's summary disallowance of those claims.  This process does not comport with the basic requirements of notice and an opportunity to be heard, and affords this Court no basis to review the disallowance on the merits.

>        Moreover, none of the Appellees address the fact that the Order also improperly addressed the indenture trustees' claims for fees and expenses which the Debtors are obligated to pay pursuant to the Indentures.  When it signed the Order stating that the Repayment Amounts were determined to be principal, accrued interest, and "reasonable prepetition indenture trustee fees as provided under the Indentures" (App. 2) [Docket No. 5595] the Bankruptcy Court put into issue what constitutes prepetition indenture trustee fees and expenses.  As explained in HSBC's Opening Brief, the Debtors and HSBC have differing interpretations of what constitutes prepetition indenture trustee fees under the Order.  But the point is the Debtors had not objected to HSBC's fees and expenses in the Limited Objection (nor did they object to the fees and expenses of the other indenture trustee) and without an objection, briefing, argument or finding regarding such fees and expenses, the Court erred in entering an Order which purports to resolve the issue of fees and expenses.

**CONCLUSION**

For the foregoing reasons, the reasons set forth in the Reply Brief of the 6% Noteholders, and the reasons set forth in the Opening and Reply Briefs of the Appellants in the consolidated appeals, HSBC respectfully requests that this Court reverse the Bankruptcy Court's Order in its entirety, together with such other and further relief as the Court deems just and proper.

Dated: October 1, 2007
New York, New York

Respectfully submitted,

KELLEY DRYE & WARREN LLP

By: */s/ Sarah L. Reid*
Sarah L. Reid (SR-4603)
David E. Retter (DR-4014)
Damon W. Suden (DS-8384)
Jennifer A. Christian (JC-7305)
101 Park Avenue
New York, New York 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

HSBC BANK USA, N.A., AS SUCCESSOR INDENTURE TRUSTEE FOR THE 6% AND 4.75% CONTINGENT CONVERTIBLE NOTEHOLDERS